RICH v. HAMBURG–AMERICAN PACKET CO.

(District Court, E. D. Pennsylvania. August 18, 1902.)

No. 76.

1. COLLISION—STEAMSHIP AND ANCHORED BARGE.

A steamship passing down the Delaware river after daylight in the morning struck and sunk an anchored barge, laden with coal. The defenses that the barge was anchored in the channel and that there was a fog were not sustained by the proof; it being shown that the barge was within the regular anchorage grounds, and well outside the channel, and that it was sufficiently clear to permit objects to be seen at a distance of a mile. *Held*, that the steamship was in fault, both for being outside the channel, and for failing to maintain an efficient lookout.

2. SAME—CLAIM OF EXEMPTION—CARRYING LICENSED PILOT.

There can be no exemption of the owners of a vessel from liability for a collision on the ground that she was in charge of a licensed pilot, whose taking was compulsory under the law, unless it is affirmatively shown that the pilot was solely in fault.

8. SAME—CONTRIBUTORY FAULT—ANCHOR WATCH.

A barge anchored in known anchorage grounds, outside the channel used by passing vessels, cannot be held in fault for a collision with a moving vessel in the daytime, and in the absence of fog, on the ground that she had no anchor watch, which it was not customary to maintain under such conditions.

In Admiralty. Action in personam for collision.

Francis C. Adler and John F. Lewis, for libelant.

J. Rodman Paul, Biddle & Ward, and J. Wilson Leakin, for respondent.

J. B. McPHERSON, District Judge. This is an action in personam to recover damages for a collision between the steamship Bengalia and the barge Iron State, in which the barge and her cargo were sunk, and, so far as now appears, became a total loss. The collision occurred about 6 o'clock in the morning of September 27, 1900, while the barge was lying at anchor in the Delaware river near Gloucester, and the Bengalia was proceeding to the capes, on her way to Baltimore. The Iron State was a wooden vessel 214 feet long, with a carrying capacity of 1,700 tons, and at the time of the accident was loaded with coal, and awaiting a tug to tow her to a New England port. The Bengalia is a large steel steamship, 500 feet long and about 60 feet beam. She had on board 5,000 tons of cargo, and was bound for the port of Baltimore, where the rest of her cargo was to be loaded. She was drawing 22 feet 7 inches forward, and 23 feet 6 inches aft. The tide was ebb, running about 3½ or 4 miles an hour, and the bow of the barge was pointing upstream. There was no wind, or very little; and, if there was no fog,—a point to be considered in a moment,—there was daylight enough to permit objects to be seen without difficulty more than a mile distant. The bow of the Bengalia struck the port bow of the barge a severe blow about 40 feet aft of the stem, crushing in the side for a space of about 6 feet, tearing her loose from her anchorage,—the anchor weighed 4,000

¶ 2. See Collision, vol. 10, Cent. Dig. § 236.

pounds, and about 15 fathoms of chain were out,—and carrying her against the bow of another barge, also at anchor several hundred feet farther down the stream, by which her starboard side was also crushed in; the result being that she filled and sank in a short time.

The barge being at anchor, and the Bengalia being the moving vessel, the steamship was presumptively at fault; and the burden of proof is upon her to show that she was wholly innocent, or at least was only partly to blame. Her first defense is that the barge was anchored in the channel, directly in the road of passing vessels, and it is therefore important to determine first of all whether this averment is true. I have no hesitation in finding that the evidence not only does not support it, but establishes satisfactorily that the barge had been for three days on the regular anchorage ground near Gloucester, and that her position was well to the eastward of the channel, where she was entirely safe from any passing vessel that was pursuing a proper course. Many other vessels were at anchor in the neighborhood, and the disinterested testimony concerning the position of the barge leaves me in no doubt that she was where she had a right to be, and that the Bengalia could not have struck her if the steamship had not been out of her proper course.

This brings us to the second defense, namely, that there was a dense fog shortly preceding and at the time of the collision; that the atmosphere was clear when the Bengalia left her moorings, about 5:30, but soon became so thick that objects could only be seen about 100 feet away; that it was hazardous to anchor in the narrow channel, and the steamship accordingly was compelled to proceed, but continued at a very slow speed, giving fog signals and maintaining an efficient lookout; but, in spite of all precautions, that the barge, which was giving no signals and had no anchor watch, could not be seen or heard until the vessels were so near that the collision could not possibly be avoided. Of course, if there was no fog, the whole of this defense disappears, and I am thoroughly satisfied that there was no such impediment to sight as the steamship's witnesses describe. It is probable that the morning was misty; but, if any reliance is to be placed upon disinterested testimony, the mist did not offer any serious obstacle to vision. As already stated, there were many vessels on the anchorage ground, and, moreover, a ferryboat was close at hand when the collision took place, to say nothing of witnesses on shore that were probably available, but only one witness was called to corroborate the officers and crew on this material point, while there is an abundance of apparently unbiased testimony from the ferryboat and from other vessels on the anchorage ground to the effect that there was no fog, and that the shores and other objects could easily be seen for more than a mile. This is corroborated, also, by the officers of the steamship themselves, for they admit that they heard no fog signals from any of the vessels at anchor; and such a universal silence would, I think, be most unlikely, if a dangerous fog had suddenly enveloped the river. Further, the steamship's own testimony concerning the coming on and the duration of the fog is so contradictory that I should hesitate to accept it, even if the opposing witnesses were not in the case.

Dismissing the fog, therefore, as an exaggeration of a light September haze, the prima facie fault of the steamship is not excused, and she must be held to have been to blame. Precisely why she got out of her course, the testimony leaves somewhat in doubt; but I feel justified in drawing the inference either that her steering gear did not work satisfactorily, or that she took a sheer for some reason that is not explained, or that the pilot's orders, which were given in English, and translated into German for the wheelsman, may have been misunderstood or incorrectly transmitted. But in any event it seems clear, also, that the lookout must have been inefficiently maintained. Whatever it may have been that took the steamship over upon the anchorage grounds, where she had no business to be, the vision of those upon the lookout could not have been affected thereby; and, since it satisfactorily appears that the barge could have been seen a mile away, it was the duty of the seaman on the lookout, or of the officers on the bridge, to see her in sufficient time to avoid her. They all agree that they did not see her until she was too near to be escaped, and, since there was no fog to excuse their failure of vision, the fault of the ship's servants in this vital respect seems to me to be plain.

At the argument a further attempt was made to defend upon the ground that an action in personam could not be maintained because the steamship was in charge of a licensed pilot at the time of the collision. To take such a pilot on board was said to be compulsory under the Pennsylvania act of 1803, and it was denied that he was the servant of the owners in any such sense as would subject them to an action in personam for his default. The precise point has never been decided in America, so far as I am aware, and I do not feel bound to decide it in the present case. Indeed, it does not properly arise upon the facts as I have just found them; for, even if the pilot was at fault in conducting the vessel out of her course,—and I cannot find that fact specifically upon the evidence,—the concurring fault of the ship's officers or men in failing to maintain an efficient lookout contributed materially to the collision, and it is well settled that in such event the owners are liable. The following propositions laid down in The China, 7 Wall. 63, 64, 19 L. Ed. 67, show, I think, that this defense cannot prevail in the present case:

"The statute giving the immunity where a licensed pilot is employed abridges the natural right of the injured party to compensation, and is therefore to be construed strictly.

"The exemption applies only where the pilot is actually in charge of the vessel, and solely in fault.

"If there be anything which concurred with the fault of the pilot in producing the accident, the exemption does not apply, and the vessel, master, and owners are liable.

"The colliding vessel is in all cases prima facie responsible.

"The burden of proof rests upon the party claiming the benefit of the exemption. He must show affirmatively that the pilot was in fault, and that there was no fault on the part of the officers or crew 'which might have been in any degree conducive to the damage.' "

I have serious doubts, also, whether this defense was properly raised by the pleadings, or is based upon sufficient evidence to allow

117 F.—48

me to consider it. And still further, as the cases stand, the question whether the Pennsylvania statute is compulsory is still open in the federal courts, while the state decisions hold that the act does not oblige a vessel to take a pilot. The Pennsylvania authorities are referred to in Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique, 182 U. S. 414, 21 Sup. Ct. 835, 45 L. Ed. 1155. In such a situation, I do not feel disposed to go out of my way to express an opinion upon so important a subject. It will be decided when it is distinctly raised by the pleadings and properly supported by the proofs.

It remains to consider whether the barge was also at fault. Nothing is left upon this point, except her failure to keep an anchor watch; and this, I think, was not negligence, under the circumstances of the present case. She was upon a known anchorage ground, well out of the road of passing ships; she had a proper light burning, although the daylight had ceased to make this fact important; and I do not think she was bound to anticipate that another vessel, in the daytime and not in a fog, would get so far out of her proper course as to become a menace. The evidence shows that, unless the owners of barges order an anchor watch to be kept, it is not customary to keep it, and I cannot say that the Iron State was to blame in the present instance. No doubt, the barge took the risk of her light going out, or of a fog coming down and making signals necessary, but neither risk fell out against her; and I am of opinion that she was not bound to anticipate an unlikely collision, and to keep a watch on deck in order to attempt to let out her chain or to maneuver with her helm. Whether either attempt would have been successful, I have much doubt.

The libelant is entitled to a decree, with costs.