## CHASE v. HAMMOND LUMBER CO. et al.*

### No. 7860.

Circuit Court of Appeals. Ninth Circuit.

Nov. 4, 1935.

Ashby C. Dickson and George S. Shepherd, both of Portland, Or., for appellant.

E. L. McDougal, of Portland, Or., for appellees.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by Harry Chase, a Columbia river pilot, from a decree based upon a finding of his negligence in piloting the Hammond Lumber Company's steam schooner Watsonville on the Columbia river in a turning maneuver from the main channel of the river into the channel leading to the Weyerhauser dock at Longview, Wash. The lower court found that as the result of the pilot's negligence the Watsonville came in contact with a flashing light known as "La Du Front Range Light," which was supported by wooden dolphins in the river and stood to the height of some twenty-five feet. The Hammond Lumber Company is not shown to have any property interest in the dolphins or the light, and the briefs assume that they belong to the United States. The court below decreed a liability against the pilot in part in favor of the Hammond Lumber Company and the balance in favor

*Rehearing denied Jan. 13, 1936.

of the United States Merchants & Shippers Insurance Company of New York.

The libel alleged on behalf of the insurance company that it insured the Hammond Lumber Company against property damage. There is no allegation of any insurance of the *liability* of the Hammond Lumber Company to a third person for injury to the property of that person. The article of the libel in question reads as follows: "III. That on or about July 1st, 1931, the libelant, United States Merchants & Shippers Insurance Company of New York, a corporation, issued to the libelant, Hammond Lumber Company, a corporation, its policy of insurance number 231633 for a period of one year covering the operations of the Steam Schooner 'Watsonville' in the Columbia River and other ports visited by said Steam Schooner 'Watsonville,' said policy of insurance covering said libelant, Hammond Lumber Company, a corporation, and Steam Schooner, 'Watsonville' for all property that might be damaged arising out of the operations of said Steam Schooner 'Watsonville.'"

It is an elementary principle of marine insurance law that insurance cannot be created against injury to property in which the insured has no insurable interest and, as we have pointed out, no insurable interest of the Hammond Lumber Company in the dolphins and light is alleged and the contrary is assumed to be true by the litigants. Therefore, the insurance company stands with respect to any moneys alleged to have been expended by it as having made a volunteer payment to some one not described in the libel.

The pilot by timely exception raised the question of the volunteer character of the payment, which exception was overruled. However, even in the absence of the exception, the obvious failure of the insurance company to state a cause of action would require our notice.

The pilot's answer denied the allegations of article III set forth above. The brief on behalf of the appellee insurance company states there was a stipulation admitting the truth of the allegations of article III, but no such stipulation appears in the record. An admission of the truth of the allegation, if made, does not change its construction.

The policy was not introduced in evidence. Had the insurance contract contained a marine *liability* policy, sometimes used, substantially providing that the insurance company would pay the Hammond Lumber Company "if the Hammond Lumber Company had become liable to pay a third party for damage caused by its ship and had paid the same," and if the liability policy conditions had been proved to be satisfied, we would have the power of amending the libel on appeal to correspond with the proof. No such policy was offered in proof, and we cannot find a liability insurance established in the record. The decree must be reversed as to the liability of the pilot to the insurance company and he be decreed here not liable to that company.

With regard to the question of the alleged negligence of the pilot, the libel charges that this consisted in a failure to use his anchor in turning to his starboard out of the main channel of the Columbia river on a 150-degree turn in the limited turning radius into the channel leading to the Weyerhauser dock. An expert witness testified in the lower court that "it is not safe" to make the turn without the use of the anchor. Chase had a federal as well as a state license. On cross-examination, the pilot admitted that he had testified before the United States Inspectors, in a hearing in which he was charged with negligence in the exercise of his functions under his federal license in failing to use the ship's anchor in the turn, that, "If I knew what I know now, I would have used" the anchor.

The District Judge could have well inferred that what the pilot now knows should have been known at the time of the accident, since the charts in evidence show clearly what was the problem of navigation. There is sufficient in the evidence to support the finding of the court below that the failure to use the anchor in making the turn at night before commencing or during the turn constituted the proximate cause of the injury to the light, and hence the finding must be sustained. The Beaver (The Necanicum) (C. C. A. 9) 253 F. 312, 313.

The captain of the vessel died before the hearing below and, in that hearing, the pilot, for the first time, testified that the accident was caused by the captain turning on the searchlight to assist in picking up a spar buoy on the starboard side of the vessel. This buoy marked the southerly entrance to the channel leading to the

Weyerhauser dock and into which the Watsonville attempted the 150-degree starboard turning maneuver. The glare of the searchlight, it was claimed, obscured the pilot's vision of the range and other guiding lights and confused his estimation of distance, thereby causing his miscalculation which brought the steamer in contact with the dolphins. On cross-examination it was disclosed that, although on trial before the Inspectors on a charge of negligent navigation, he had at no time suggested there either that the searchlight had been turned on or that he had in any way been embarrassed by any such act of the captain. Being pressed on cross-examination, the pilot testified:

"Q. You said you had a reason for not telling about the range. How about the searchlight?

"The Court: I think I would like to know his reason.

"Q. Just tell the court just why that was. A. Well, on the ship the master is master, and we are working together on these things, and if you go up there and tell all about it he is apt to lose his job, and it only means five or ten days to us, suspending our license that long, so I thought that would be the best way out of it.

"Court: Was he living at that time? A. Oh, yes. He made no mention of it in his report to the inspectors, neither did I, and on the investigation I didn't bring it up either."

One of the most important functions of the United States Inspectors with regard to the safety of life in sea-going vessels is the determination of responsibility for negligent navigation. Primarily by the discipline of the Inspectors are navigating officers held to a proper regard for the safety of the persons and property intrusted to their care. By their investigations and findings in charges of even minor infractions of the rules or of bad navigation vessel owners become acquainted with the character of their officers. An admiralty court cannot ignore the number of recent disasters at sea, in relation to which the necessity for efficient discharge of the Inspectors' duties is of demonstrated vital public concern.

The quoted language is an audacious claim of both an intent to suppress and a suppression of the facts at the Inspectors' investigation. We place no credence whatsoever in the testimony of one admitting such gross, if not criminal, suppression of evidence before the Inspectors. With respect to the dead captain, who is not here to meet the inferences from the testimony of the pilot, we regard the pilot's testimony concerning the embarrassment from the searchlight as a mendacious after-created excuse. We therefore affirm so much of the decree as awards damages to the Hammond Lumber Company.

It is ordered that a decree be entered affirming the decree below as to the Hammond Lumber Company, reversing as to the United States Merchants & Shippers Insurance Company, and that the United States Merchants & Shippers Insurance Company take nothing by its libel.