BARBEY PACKING CORPORATION, a corporation, Libelant,

v.

THE S. S. STAVROS, her engines, cargo, tackle, and gear, Respondent.

KASSOS STEAM NAVIGATION CO., Ltd., Claimant, Petitioner,

v.

H. W. GORE, Impleaded Respondent.

Civ. No. 8728.

United States District Court
D. Oregon.

Jan. 22, 1959.

898

W. E. Tassock, Portland, Or., for libelant.

John R. Brooke, Portland, Or., for respondent.

Erskine Wood, Portland, Or., for claimant, petitioner.

Alex Parks, Portland, Or., for impleaded respondent.

EAST, District Judge.

Heretofore, the Libelant, Barbey Packing Corporation, recovered judgment against the Respondent for collision damages in the amount of $7,031.15. This Court's order reserved for further consideration the segregated issue of who was in command and/or control of the

vessel S. S. Stavros at the time of the collision involved.[1]

The S. S. Stavros, through her owner, Kassos Steam Navigation Co., Ltd., a citizen of Greece, satisfied the above judgment, and the Libelant, having been compensated for its hurt, is no longer before the Court. Hence, the reserved issue which Claimant-Petitioner contends fastens said liability upon the Impleaded Respondent H. W. Gore.

It appears from the evidence that on July 22, 1956, the S. S. Stavros, a vessel of a type commonly referred to as a "liberty ship," was docked in the Port of Portland. It was the vessel's desire to move down river from Portland to Astoria, Oregon, some 85 river miles distant. To aid in the safe passage of the Stavros, the vessel engaged the services of the Impleaded Respondent H. W. Gore, a river pilot of four years' piloting experience. H. W. Gore is a duly licensed pilot under the provisions of Oregon Revised Statutes, Chap. 776, and a member of the pilots' self-regulatory group known as the "Columbia River Pilots," an unincorporated association. At the time in question the vessel was, as is known in the terms of the sea, "light," that is, she was not heavily laden with cargo and drew only 13' 7" aft and 6' 3" forward. At approximately 4:00 p. m. on July 22, 1956, while the Stavros was approaching the Astoria Port Dock, the vessel collided with the stationary Barbey Dock, which adjoins the Port of Astoria Dock.

It appears to be uncontroverted that the pilot, H. W. Gore, had directed the Stavros' operation since the vessel became "under way" in Portland. On the bridge with the pilot was the ship's master, M. Poulis, the third mate, and the ship's quartermaster, all nationals of Greece. Since leaving Portland the Stavros had proceeded down the Columbia River without incident, and was approaching Astoria on the port side of the navigable channel heading in a westerly direction, running approximately 8 knots.

Upon approaching the Astoria Port Dock, the pilot gave the successive commands of half ahead, slow ahead, and then stop, which reduced the vessel's speed to a point where she became dead in the water, consequently lost her steerage, and was allowed to drift.

At this point the Stavros was some 200 feet upstream from the Barbey Dock and 300 feet out in the channel. The Barbey Dock is some 200 feet long and runs east and west. Connected to and adjoining the Barbey Dock is the Port of Astoria Dock, which extends another 1,000 feet to the west. At the west end of the Astoria Port Dock is a slip which runs at an approximately 62° angle south of the face of the Astoria Port and Barbey Docks. It was into this slip which the Stavros was to be maneuvered. At the time a small ebb tide was running and there was a steady northwest wind of some 20–25 miles per hour. It was the pilot's theory to drop the ship's anchor and then drag the same slowly past the corner of the Astoria Port Dock, let the wind steady the bow around, using the corner of the Port Dock for a pivotal point, and then ease slow ahead into the slip.

Pursuant to this plan, the pilot ordered the vessel one-half astern while still upstream or east of the Barbey and Astoria Port Docks and about 300 feet off the Docks. Half-astern on a vessel of this type has a tendency to swing the ship's stern to the port side. The pilot then ordered 15 fathoms on the starboard bow anchor to stop the vessel's drift toward the Barbey Dock. When this failed to correct the drift, the pilot ordered full ahead and hard port rudder, but this action also failed to correct the vessel's drift and the Stavros' stern quarter came into contact with the east corner dolphin of the Barbey Dock, which in turn struck the Barbey Dock proper and caused the damage alluded to. After this contact the Stavros was docked in a manner pursuant to the pilot's original plan.

In the Court's Memorandum dated December 23, 1957, the Court found

1. See Judge East's Memorandum opinion entered December 23, 1957. 170 F.Supp. 260.

the cause of the collision was by reason of the fault and negligence of the Stavros in:

(1) Navigating too close to the Barbey Dock in view of the existing conditions of wind and tide; and

(2) Failing to keep the vessel under full control so as to avoid striking the Dock.

■ Impleaded Respondent Gore indicates he is not clear about the Court's ruling that the Stavros was "too close" to the Barbey Dock. To clear the record, the Court had reference to the navigation of the vessel within 300 feet of the Barbey Dock and not any subsequent event which occurred to cause the collision. Taking into consideration the wind and the width of the channel (which at this point would easily allow a vessel to pass the Dock some 600 feet distant) the maneuvering of the vessel so close to the Barbey Dock was itself negligent. The Court cannot adhere to Gore's statement that to attempt another method of entering the slip with a 20–25 mile per hour tail wind and a light ship would be "comparable to attempting to shove a telephone pole through a keyhole while running at full speed." If there was no alternative way of entering the slip, common sense would seem to dictate that the vessel wait until conditions were such that safe passage could be made. Testimony by Captain Gore that he had on numerous occasions passed much closer to the Barbey Dock in carrying out this same maneuver does not excuse the ship's actions. It is immaterial that the usual custom was followed. A negligent custom is no defense. Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905; Charente S. S. Co. v. United States, 5 Cir., 12 F.2d 412.

■ The primary question of fact presented this Court concerns the Impleaded Respondent Gore's contention that his order to drop the Stavros' anchor was not carried out in a seamanlike manner and the proximate result of said failure was the subsequent collision. It is a settled proposition that the pilot is entitled to proper cooperation from the ship's officers and crew. The Paris, D.C., 37 F.2d 734, affirmed 2 Cir., 44 F.2d 1018; Rich v. Hamburg-American Packet Co., D.C.1902, 117 F. 751. It is up to this Court now to determine if Captain Gore received this cooperation. To set the stage, so to speak, for consideration of the action or lack of action on the part of the vessel's crew, a complete understanding of the vessel's physical position and the events leading up to the claimed lack of cooperation is necessary.

The vessel was situated some 200 feet off the Barbey Dock. There was a steady 20–25 m. p. h. northwest wind. Because the vessel was "light" she was sitting high in the water and had a large "sail area" exposed to the prevailing wind. This wind had a definite tendency to force the Stavros toward the Barbey Dock. The wind had been in existence for a considerable period of time and this force was recognized by the pilot, Captain Gore, as he had stated that he was going to use the wind as an aid in docking the vessel in the Astoria Port slip. The command given by the pilot Gore of one-half astern also tended, because of the revolutions of the ship's screw, to carry the vessel toward the Barbey Dock. In the face of these existing conditions Captain Gore steadfastly maintains that the Stavros was in a place of safety. The Court has found otherwise.

Relying upon the Restatement of Torts, § 441, Comment (B),[2] the pilot

---

**2.** "*b.* '*Active*' *and* '*passive*' *negligence.* The cases in which the effect of the operation of an intervening force may be important in determining whether the negligent actor is liable for another's harm are usually, although not exclusively, cases in which the actor's negligence has created a situation harmless unless something further occurs, but capable of being made dangerous by the operation of some new force and in which the intervening force makes a potentially dangerous situation injurious. In such cases the actor's negligence is often called passive negligence, while the third person's negligence, which sets the intervening force in active operation, is called active negligence." Restatement of Torts, 1934.

Gore contends that if the close proximity of the Stavros to the Barbey Dock was negligent, such negligence created a situation that was only potentially dangerous, i. e., such negligence was passive only and could not have been the active cause of the resulting harm. The insulating factor which Captain Gore contends will absolve him of liability is the ship crew's failure to drop and set the anchor with dispatch. The Court has only the benefit of Captain Gore's testimony, as the personnel of the Stavros were not available when this cause came on for trial. However, the Court had the benefit of the answers to interrogatories propounded to the master, who at the time of the collision was on the bridge, and the chief officer, who at this point was in charge of the anchor detail deckside. And after an examination of all the evidence presented, the Court can come to no other conclusion than that the crew of the Stavros carried out the pilot's instructions in seamanlike order. It was shown that no more than the required depth of anchor was let out, and that the anchor was in fact secured properly. There is no showing of unseaworthiness in the ship's gear and the evidence points to the fulfillment of the pilot's order by the vessel's crew.

Captain Gore claims the order to drop anchor was given while the Stavros was still in a place of safety and that the anchor detail failed to respond until the vessel had drifted within 100 feet of the Dock, an area of obvious danger considering that the vessel exceeds 400 feet in length. To the Court's mind no other decision can be reached then that after the wind had started to force the ship toward the Dock and the ship's astern movement contributed to the drift dockward, the pilot ordered the anchor dropped to help correct this movement, but his order came too late.

Having found no failure on the part of the anchor detail to dispatch the anchor in seamanlike manner, it stands to reason there was no intervening force relieving Captain Gore of responsibility. A further matter presented to the Court was the failure of the Stavros to respond to the emergency full ahead as readily as other vessels might have. The vessel had only one boiler in operation (which appears to be a tramp steamer custom to preserve fuel), but this does not of itself make her unseaworthy. Captain Gore had known of this since the Stavros left the Port of Portland, and should have taken this factor into consideration during his approach to the Astoria Port Dock.

Having found that the pilot placed the vessel in such a position as to constitute an immediate threat of danger both to herself and to the Barbey Dock, and having determined that the subsequent harm done was a result of the pilot's action, does this of itself fasten liability upon the pilot and absolve the vessel? It is settled law that the fact that a pilot was on board the vessel does not release the ship's master from his duties. The master still remains in command of his vessel and retains the authority to control the actions of the pilot to assure the safety of his ship and to avoid any imminent danger. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; Ralli v. Troop, 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742; The Manchioneal, 2 Cir., 243 F. 801. The courts have held that the master not only retained the power, but had the duty to interfere in all cases of necessity or danger and to displace the pilot. The China, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67; United States v. The Westervelt (The Catherine Meseck), D.C., 135 F.Supp. 596. The earlier cases, in speaking of the master removing the pilot, were concerned only with situations where it appeared the pilot was intoxicated or manifestly incompetent. The Oregon, supra, 158 U.S. at page 194, 15 S.Ct. at page 808; The China, supra. Later cases have appeared to hold the master to a higher degree of responsibility than the earlier courts contemplated. See Jure v. United Fruit Co., 5 Cir., 6 F.2d 6; Charente S. S. Co. v. United States, supra. The master's duty to relieve the pilot rests within the master's sound discretion, and can only be viewed

in light of the surrounding factual situation. Dampskibsselskabet Atalanta A/S et al. v. United States, 5 Cir., 31 F.2d 961. In light of the obvious confusion that would exist on a vessel if, on his slightest whim, the master would countermand the pilot's order, the master to insure the safety of his command should exercise his power to remove the pilot discriminately. The master ought not to substitute his judgment for that of the pilot except in cases of obvious danger, or where danger is apparent and avoidable. Charente S. S. Co. v. United States, supra.

■■ Was such a duty imposed upon the vessel's master, M. Poulis, in this cause, i. e., should the master have:

(1) Recognized the impending danger; and

(2) Relieved the Pilot Gore of command.

Having anticipated the danger, the master may, by inaction, concur with and approve the pilot's order. The Manchioneal, supra. Counsel has raised, but the Court deems it unimportant in the consideration of this aspect of the cause, a distinction concerning whether the pilot was retained under a compulsory or noncompulsory pilotage law. In either event, a master does not surrender his authority to remove the pilot. Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A., 2 Cir., 32 F.2d 209.

■ The master's duty of anticipation of harm and removal of the pilot rests on the circumstances. Is it, or should it be apparent to the master that his vessel is entering a zone of danger and does the pilot fail to, or is he unable to anticipate and respond to the situation in a manner which will insure the safety of the vessel, then the master should and must relieve the pilot. This Court adheres to the reasoning of Judge Learned Hand in Union Shipping & Trading Co., Ltd. v. United States, 2 Cir., 127 F.2d 771, at page 775:

"'* * * the place of bringing a vessel to an anchor' being 'within the peculiar province of the pilot,' a master should not invade it until he sees, * * * that it was being plainly misgoverned."

■ The master of the Stavros had the right to anticipate that the vessel's pilot, W. H. Gore, would safely secure the vessel in the Astoria Port slip and would act, pursuant to this plan, with all due caution. The pilot steered the Stavros into a place of danger. On the evidence, this Court cannot charge the master with notice that the vessel's approach to the Port slip was being misgoverned, and, after the danger was recognized, or should have been recognized by the master, there is no showing that the master, by assuming command, could have avoided the situation that developed, that is, the collision with the Barbey Dock.

Impleaded Respondent Gore further contends that by custom, Oregon pilots serve only in an "advisory" capacity and cannot be held liable without a showing of gross or wilful negligence. In two previous cases before this Court, a Columbia River Pilot has been held liable without a showing of gross negligence. Chase v. Hammond Lumber Co., 9 Cir., 79 F.2d 716; Matheson v. Norfolk & North American Steam Shipping Co., Ltd., 9 Cir., 73 F.2d 177, but in neither of these cases was the defense of this peculiar custom raised.

Captain Gore's services as pilot were engaged by the Stavros under the Oregon Pilotage Act, which establishes what is known as "noncompulsory" pilotage, as distinguished from the so-called "compulsory" pilotage acts. This distinguishing feature is found in § 25, Chap. 448, Oregon Laws 1957, which reads in part as follows:

"No person shall pilot any vessel upon any of the pilotage grounds established under sections 2 or 4 of this Act without being a licensed pilot under this Act *unless he is the master or owner of the vessel.*" (Emphasis supplied.)

Thus, the master of the Stavros had the authority under Oregon law to move the

vessel from Portland to Astoria without the aid of a pilot. He elected instead to engage a member of the local pilot's organization to insure the safe passage of the vessel and her crew. For a fee the pilot W. H. Gore undertook to direct the Stavros' safe passage to Astoria. Applying simple contract law, one experienced in his field and possessed of special knowledge (Captain Gore) undertook to perform a service for the hiring agency (Stavros). The reason a vessel employs a pilot is because of the pilot's particular knowledge of local conditions. Compagnie de Navigation Francaise v. Burley, D.C., 183 F. 166, affirmed 9 Cir., 194 F. 335. As the Supreme Court said many years ago in Atlee v. Union Packet Co., 21 Wall. 389, at pages 396, 397, 88 U.S. 389, at pages 396, 397, 22 L.Ed. 619:

" * * * the harbor pilot, is selected for his personal knowledge of topography through which he steers his vessel. * * * He must know where the navigable channel is, * * * he must be constantly informed of * * * the action of the elements in the path of his vessel, * * *

"It may be said that this is exacting a very high order of ability in a pilot. * * * we do not think we fix the standard too high."

Under the rationale of City of Long Beach v. American President Lines, Limited, 9 Cir., 223 F.2d 853, the contract for the highly personal services of the pilot contained an implied covenant that such service would be performed with the necessary skill and without neglect. The City of Long Beach case, supra, involved a pilot hired under a compulsory pilotage act, as contrasted to the noncompulsory act here involved. A review of the applicable cases involving pilotage under both of these acts has failed to ascertain a case where this distinction has controlled the quantum of care imposed on a pilot. Courts have, by way of dicta, indicated that a certain case was affected by the fact that the employment of the harbor pilot was voluntary on the part of the ship (see City of Long Beach, supra, at page 856), but under a given fact situation this point has never been decided. If a pilot was hired to move a vessel from one point to another it is difficult to see how different standards of care would be imposed on the pilot, depending upon whether he was hired under a compulsory or noncompulsory pilotage act. Logic would seem to dictate that for the safety of the vessel, her crew, and such property as might be affected by the ship's movement, the pilot should be held to a high standard of skill and care for the safe passage of the vessel.

The Court recognizes that a valid distinction may be made between compulsory and noncompulsory pilotage laws when one is concerned with a situation such as the *in personam* liability of a shipowner to an injured party, but when looking to the primary question of fact, did the pilot's action constitute negligence, a distinction between the two pilotage acts would be a distinction without a difference. The pilot is, or is not, negligent. This Court is not presented with a contract between the vessel and the pilot whereby the pilot is expressly exempted from liability, but is concerned only with the initial question, is the pilot negligent. In line with the foregoing, the Court must reject the Impleaded Respondent Gore's contention that the pilot, under Oregon law, acts only in an advisory capacity because he was engaged under a noncompulsory pilotage act and cannot be held liable without a showing of gross negligence on his part. A showing of ordinary negligence on the part of a pilot in the performance of his duty is a maritime tort within the jurisdiction of this Court. Furthermore, the situation is analogous to an obligation on the part of a stevedore to perform his services in a workmanlike manner. See Ryan Stevedoring Co. v. Pan-Atlantic S. S. Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. The failure of the pilot in this cause to conform to the standard demanded of his profession breached an implied covenant that his services would

be performed with all necessary skill and care.

There remains the Impleaded Respondent's final contention concerning the question whether a shipowner (Kassos Steam) not libeled *in personam* may implead his vessel's pilot *in personam*, claiming recovery for a sum voluntarily paid over to the Libelant in order to relieve his vessel from an *in rem* liability. Kassos Steam, by timely motion, claimed the Respondent S. S. Stavros and obtained leave to defend this suit. On Kassos Steam's motion, H. W. Gore, the Stavros' pilot, was impleaded as a respondent before the Court and all parties were heard without prejudice. This Court has found that the pilot Gore was negligent in the performance of his duties, and that this negligence breached the existing duty of care owed the vessel's owner. On this basis the Court finds the pilot H. W. Gore answerable for the harm done. See City of Long Beach, supra.

Proctors will submit findings and decree in accordance with the foregoing.