Petition of **MARINA MERCANTE NICA-RAGUENSE, S.A.**, as owner of the **MOTOR VESSEL, EL SALVADOR,** in a cause of exoneration from or limitation of liability.

**63 Ad. 389.**

Petition of **McALLISTER BROTHERS, INC.,** as owner of the **TUG RUSSELL NO. 18,** for exoneration from or limitation of liability.

**63 Ad. 529.**

United States District Court
S. D. New York.

Nov. 15, 1965.

Cichanowicz & Callan, New York City,
for petitioner Marina Mercante Nicara-
guense, S.A.; Victor S. Cichanowicz,

George G. Kalarjian, New York City, of counsel.

Foley & Martin, New York City, for petitioner McAllister Brothers, Inc.; Christopher E. Heckman, Thomas J. Irving, New York City, of counsel.

Lilly, Sullivan & Purcell, New York City, for claimant Catherine Marie Fargo; John J. Purcell, New York City, of counsel.

Mahar & Mason, New York City, for claimant Theresa F. Salvesen; Frank C. Mason, New York City, of counsel.

Fields, Rosen, McElligott & Auslander, New York City, for claimant Virginia Ruth Evans; Thomas E. P. McElligott, Stephen Fields, New York City, of counsel.

WEINFELD, District Judge.

On September 20, 1962 the tug Russell 18, which had just assisted in undocking the M/V El Salvador, sank in Port Elizabeth Channel, Newark, New Jersey, with the loss of three of her seven crew members.

■■■ These are consolidated proceedings in which petitioner McAllister Brothers, Inc. (hereafter referred to as McAllister), owner of the tug Russell 18, and petitioner Marina Mercante Nicaraguense, S.A. (hereafter referred to as Marina), owner of the El Salvador, seek exoneration from or limitation of liability.[1] Representatives of the estates of the three deceased crew members are claimants in each proceeding and contest petitioners' limitation and exoneration pleas. Also, each petitioner challenges the other's right to limitation, and each, in the event it is cast in liability to the death claimants, seeks indemnity from the other; McAllister further is a claimant against Marina for damages to the tug Russell 18. The claimants have the burden of proof on the issue of liability, and if they sustain it each petitioner has the burden under its limitation plea of establishing that the faults or acts which resulted in liability were committed without its privity or knowledge.[2]

The petitioners and claimants, in advance of trial, agreed upon the order of presentation of evidence in support of their respective burdens.[3] Much evidence was received from those who witnessed the capsizing and sinking, with the not unusual disparity in the testimony of seamen. Also offered was evidence bearing on the stability of the tug. Then there was the testimony of the diver who located the tug at the bottom of the channel and there placed slings about her, preparatory to raising and towing her to dry dock, as well as that of surveyors who examined her at dry dock, one of whom, a marine architect, gave his opinion as to the cause of her foundering. Essentially, the principal issue is the cause or causes of the tug's sudden sinking in a matter of two or three minutes in the quiet and calm waters of Port Elizabeth Channel.

The tragedy occurred in the early morning hours, at about 5:30 a. m., in darkness. The tug Russell 18 had been engaged to assist the El Salvador from her berth at Pier 36 in Port Elizabeth, Newark, New Jersey, to Pier 3 in Brooklyn, New York. John Skogen, a harbor pilot employed by McAllister, was assigned to act as pilot for the trip.

The Russell 18 left Brooklyn at about 3:30 a. m. and proceeded to Port Elizabeth Channel. Those aboard were Skogen, the three deceased, Norman Evans,

1. See generally, 46 U.S.C. §§ 183–188; Fed.Admiralty R. 51–54.

2. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 107, 114, 62 S.Ct. 156, 86 L.Ed. 89 (1941); In re W. E. Hedger Co., 59 F.2d 982 (2d Cir. 1932); The 84–H, 296 F. 427, 432 (2d Cir. 1923), cert. denied, 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867 (1924); The Titanic, 225 F. 747, 748 (2d Cir. 1915); The Doris Kellogg, 18 F.Supp. 159, 164 (S.D.N.Y.1937), aff'd, 94 F.2d 1015 (2d Cir. 1938).

3. See Petition of Moore-McCormack Lines, Inc., 147 F.Supp. 816, 819–820 (S.D.N.Y. 1957); The S.S. Hewitt, 284 F. 911, 912 (S.D.N.Y.1922).

Frank Fargo and Carl Salvesen, and the four surviving crew members. The approach to Pier 36 where the El Salvador was berthed was by way of Port Elizabeth Channel from its junction with Newark Bay Channel. As the tug neared Port Elizabeth Channel Skogen sought, but was unable to locate a black buoy—black buoy can No. 1—supposedly situated on the southerly side of the channel at the junction. The tug, not having located the black buoy, nonetheless entered Port Elizabeth Channel guided by four red unlighted can buoys to the tug's starboard, numbered 2, 4, 6 and 8, respectively; the distance between each was about 900 feet. The distance from where the tug entered the channel to where the El Salvador was moored at Pier 36 was about 3600 feet. The channel is about 600 feet wide and dredged to a depth of thirty-five feet.

The tug reached Pier 36 about 5 a. m., where Skogen disembarked and boarded the El Salvador. Under Skogen's direction the El Salvador was maneuvered away from her berth without incident. The vessel, still under Skogen's direction, then executed a ninety degree port turn into Elizabeth Channel and headed toward the junction with Newark Bay Channel, which she would now enter by a starboard turn on her planned passage to Brooklyn. The Russell 18 was tied to the port side of the El Salvador on a line thirty to forty feet in length made fast from the tug's forward bitts to the El Salvador's cleat. As the tug and ship proceeded toward the junction, the bow of the tug was against the side of the El Salvador aft of the forecastle head, with the pilot house forward of the ship's bridge and the tug's stern about four feet away from the ship.

As the El Salvador started to move down the straightaway of Port Elizabeth Channel with the Russell 18 made fast on her port side, Skogen, the pilot, positioned himself on the starboard wing of the ship's bridge about twenty-five feet

from the ship's wheel to search in the darkness for the same black buoy can No. 1 which he had not located when the tug entered the channel and which Skogen believed now,[4] on his return trip, was off the starboard side. He intended it as a guide to make the starboard turn into Newark Bay Channel. As he exited from Port Elizabeth Channel, the four red unlighted can buoys were now on the port side in reverse order, numbered 8, 6, 4 and 2, respectively. Hansen, the master of the El Salvador, was also on the starboard wing. The pilot's orders were transmitted by the master to the engine room for execution.

When the ship left the dock Skogen ordered her engines put at slow ahead and then half ahead because the engine was slow and sluggish; meanwhile the tug's searchlight was played on buoy No. 8 and then on buoy No. 6, which was about fifteen feet from the tug's port side. When the El Salvador was abreast of buoy No. 6, Skogen observed a tanker assisted by two tugs proceeding southbound down Newark Bay Channel toward the junction of the two channels, which he felt he could reach before the tanker and make his starboard turn. Although he was still endeavoring to locate black buoy No. 1, he ordered full speed ahead, giving the El Salvador a speed through the water of about seven knots, or eight miles an hour over the ground. Subsequently Skogen ordered hard astarboard, and upon the master's instructions the order was executed by the wheelsman. No signal was given to the tug to indicate change in speed or course.

At or about this time Forbes, the El Salvador's boatswain, stationed at the cleat to which the Russell 18's single line was made fast, saw the line under a heavy strain. He also observed the tug listing heavily to port, water going over her, and several men on the bulwark of the tug yelling excitedly. Although he could not understand them, he sensed a situation of danger. Without giving no-

---

4. In fact, the buoy was not on station on September 20, 1962, of which Skogen was unaware until after the disaster.

tice to the bridge, and without orders from the bridge, Forbes, unable to release the line from the tug to the El Salvador because of the heavy strain, cut it.[5]

The tug, cast adrift, still listing heavily to port and unable to keep pace with the ship, began to fall behind. As the tug drifted astern, she was rubbing along the ship's side, taking water over her stern and sinking fast When clear of the ship she turned starboard, capsized and soon went under stern first on her port beam to the starboard side of Elizabeth Channel. No rescue operations were undertaken by the El Salvador's personnel. No life rings, jackets, or lines were thrown to the tug; no lifeboats were launched and no lights were shone or flares dropped on the area where the tug went down. A move by the boatswain to lower a Jacobs ladder was futile, since the tug had already drifted astern of the El Salvador. Fargo, Evans and Salvesen were not seen alive thereafter. The other crew members were rescued by the tugs which had been towing the tanker down Newark Bay Channel, after the El Salvador signalled them to come to the disaster scene.

Skogen, who had been on the starboard wing in his effort to locate black buoy No. 1, first learned that the Russell 18 was in trouble either from the El Salvador's master or from a whistle by the tug. He started for the center of the bridge, meanwhile giving orders to reduce speed—first, to half ahead, then to slow, and finally to stop. When he saw the tug, after she had been cast adrift, moving aft along the ship, Skogen ordered the wheel hard left to avoid contact between the ship's propeller and the tug.

While these events were taking place, Orville Evans, the chief engineer of the

tug, became aware of trouble at his station in the engine room. After the undocking of the El Salvador, as she and the tug proceeded into Port Elizabeth Channel, the tug developed a slight but noticeable port list. About two minutes later, when the tug's engines were operating at full speed, Evans heard a squealing noise. Upon inspection to ascertain the cause, hot oil squirted in his face. Because it was hot Evans concluded it came from the steering mechanism, a conclusion verified by subsequent events. He next heard the engines straining or laboring, soon followed by water coming into the engine room over the upper half of a Dutch door. The tug continued to list heavily to port and was going under. He made his escape from the engine room as the tug was going down.

■ The Court is persuaded that the straining of the tug and the pressure in the steering system which caused the oil to squirt in Evans' face resulted from the application of an external force—contact of the tug's rudder with the port bank of the channel—in short, that the tug struck the bank immediately before she sank.

■ A number of facts support this finding. In addition to Evans' testimony, the survey made when the tug was in dry dock indicated that a tin can float gauge in the sump tank had been crushed; unchallenged is the testimony that only the application to the rudder of pressure from outside the vessel could have caused this. Over and beyond is the credible and persuasive testimony of Edward Ganly, a naval architect and marine surveyor, as to the tug's physical condition during his several examinations of her in dry dock. His testimony fully supports a finding that the tug

---

5. The testimony of Derr, the Russell 18's deckhand, reflects the strain and excitement of the fast-moving events. He testified that he loosened the line from the tug to the ship at or about the time Forbes cut it. However, his testimony on this subject is questionable. It is challenged by the diver, who testified that he found the line still connected to the tug's bitts when she lay at the bottom of the channel. Moreover, if in fact Derr had loosened the line before Forbes had cut it, there would not have been the very heavy strain which Forbes said prevented him from releasing the line.

struck the bank immediately before she sank.[6] He found the tug's rudder and steering gear in a hard to starboard position beyond their normal stops—a position into which they could not have been pushed except by some external force—the same force which caused the hot oil to squirt in Evans' face and crushed the tin can float gauge in the sump tank. He also found damage to the tug's clutch resulting from its slipping in the ahead motion, which indicated that the "propeller itself was digging into the ground or bank against which the tug was being forced." The port side of the rudder had a fracture of such nature as would have occurred by the tug being dragged along the channel bank.

Ganly also found mud on the tug's propeller and on her rudder, five feet up on the port side, but only two feet, seven inches on the starboard side; mud, rust and scrapings were on her hull. This indicated contact with the ground. Ganly's findings as to the mud on the propeller are particularly significant. His unchallenged opinion was that the mud got on the propeller while it was turning. Since the propeller stopped turning immediately before the tug went under, the mud could not have come from that part of the channel bottom to which the tug sank. This finds support in the fact that no mud was found on the propeller blade which was closest to the bottom after the sinking and that the propeller, when first seen by the diver, was lying in the clear open water about two feet from the bottom. The evidence is convincing that the source of the mud was the channel bank.

Having found that the tug struck the channel bank after it had developed a severe port list, the question remains who was responsible. The Court concludes that both vessels, the Russell 18 and the El Salvador, by negligent acts and conduct, substantially contributed to the tug's sinking, and each bears responsibility for the casualty.

The El Salvador was negligent in a number of respects. An outstandingly egregious act was the cutting of the line by Forbes, the boatswain, without notifying the bridge that the tug was in difficulty and when he was unaware of the cause of her listing.[7] Negligent conduct is also attributable to the first mate, who likewise failed to report the tug's plight to the ship's master and pilot for appropriate action before the line was severed. There can be little doubt as to what prudent seamanship required. The answer is given by both the pilot and the master. Skogen testified that had he been notified of the tug's difficulty he would have immediately stopped the ship, reversed the engines, dropped the anchor, rendered all assistance to the tug and, if need be, beached the vessel.[8] Hansen, the master, made it perfectly clear that he would not have cut the line but would have kept the tug

6. While Marina contends the Russell 18 did not strike the bank, it failed to call any of its surveyors or experts who examined the Russell 18. The unexplained failure to call the only witnesses who were in a position to challenge Ganly's testimony permits the inference that their testimony would corroborate his. See Steiner v. Commissioner, 350 F.2d 217, 222–223 (7th Cir. 1965); Cullers v. Commissioner, 237 F.2d 611, 617 (8th Cir. 1956); Pacific-Atlantic S.S. Co. v. United States, 175 F.2d 632, 636 (4th Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949) (dictum); Petition of Landi, 194 F.Supp. 353, 360 (S.D.N.Y.1960). Cf. Cafritz v. Corporation Audit Co., 60 F. Supp. 627, 632 (D.D.C.1945), modified on other grounds, 156 F.2d 839 (D.C.Cir. 1946). Our finding that the Russell 18 struck the bank necessarily rejects Marina's further claim, also contradicted by credible evidence, that the El Salvador and the Russell 18 at all relevant times were in the center of Port Elizabeth Channel and that hence the tug could not have struck the channel bank.

7. Cf. Young Bros. v. Cho., 183 F.2d 176, 178 (9th Cir. 1950). See also, Sternberg Dredging Co. v. Moran Towing & Transp. Co., 200 F.2d 603 (2d Cir. 1952).

8. Compare Curtis Bay Towing Co. v. Southern Lighterage Corp., 200 F.2d 33, 35 (4th Cir. 1952).

alongside until he knew the cause of her listing and apparent sinking.[9] And even Forbes recognized his error, when upon the trial he acknowledged that he did not know what caused the tug to list, but assumed that when he cut the line the tug would not sink but would straighten up. He conceded that, had the tug not been cast adrift, it would have been an easy matter to drop a Jacobs ladder or even put down a gangway to enable the tug's crew to leave in safety.

The El Salvador is further chargeable with fault by reason of the negligent acts and conduct of both the pilot [10] and the master. Pilot Skogen, while on the starboard wing still searching in vain for black can buoy No. 1, ordered the El Salvador as she passed red can buoy No. 6 on full ahead, so that with the tug at her side she attained in the darkness and narrow channel a speed of seven knots. Under existing conditions this speed in the narrow waters was excessive.[11] The speed caused the El Salvador to pull the Russell 18 and the line between the two vessels to strain, which in turn caused the Russell 18 to list noticeably.[12] The improvidence of the order, executed without notice to the tug, is emphasized by the fact that, when he gave it, Skogen did not know whether the tug could keep pace with the full ahead speed of the ship, while he did know, or should have known, that a tug being pulled too fast

by a ship not only readily develops a list and takes water, but also is in danger of "tripping" or turning over.

The tug's peril was further compounded when Skogen, still not having located the elusive black buoy, subsequently ordered a hard starboard turn to effect his entrance into Newark Bay Channel. Skogen admitted that he did not know the actual distance between the El Salvador and the port bank of the channel and was not certain that the wheelsman was keeping to the course he had set. The effect of this improvident order,[13] again without signal to the tug, was to cause the stern of the Russell 18, whose port side was in fact perilously close to the bank, to strike against it, and the resulting contact pushed the tug's rudder starboard. A starboard rudder normally causes a tug to list to port; in this instance it so accentuated the already heavy port list that the tug, which had only a one foot freeboard, took water immediately, capsized and sank quickly.

The El Salvador also is chargeable with the failure of Hansen, her master, to countermand Skogen's obviously improvident full speed and starboard orders.[14] Hansen was on the El Salvador's bridge during the undocking and subsequent passage down Port Elizabeth Channel, and was aware that Skogen gave the orders without being certain of

---

9. Compare Sternberg Dredging Co. v. Moran Towing & Transp. Co., 196 F.2d 1002, 1005 (2d Cir.), rehearing denied, 200 F. 2d 603 (2d Cir. 1952).

10. See Logue Stevedoring Corp. v. The Dalzellance, 198 F.2d 369, 371–372 (2d Cir. 1952); The Helen, 5 F.2d 54, 56 (2d Cir. 1924); Pennsylvania R.R. v. The S.S. Beatrice, 161 F.Supp. 136, 145–146 (S.D. N.Y.1958), aff'd, 275 F.2d 209, 212–213 (2d Cir. 1960).

11. Cf. Barbey Packing Corp. v. The S.S. Stavros, 169 F.Supp. 897, 899–900 (D. Ore.1959).

12. Compare The Perth Amboy No. 4, 135 F.2d 404 (2d Cir. 1943).

13. Cf. Barbey Packing Corp. v. The S.S. Stavros, 169 F.Supp. 897, 899–900 (D. Ore.1959).

14. See Pennsylvania R.R. v. The Beatrice, 275 F.2d 209, 212 (2d Cir. 1960); Park S.S. Co. v. Cities Service Oil Co., 188 F. 2d 804, 806 (2d Cir.), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951) (dictum); Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A., 32 F.2d 209 (2d Cir.), cert. denied, 280 U.S. 574, 50 S.Ct. 30, 74 L.Ed. 626 (1929); Jure v. United Fruit Co., 6 F.2d 6 (5th Cir. 1925); Barbey Packing Corp. v. The S.S. Stavros, 169 F.Supp. 897, 901 (D. Ore.1959); The Emma T. Grimes, 2 F. Supp. 319 (S.D.N.Y.1933).

the El Salvador's course. Indeed, Hansen had himself never looked to see if the El Salvador was keeping to a proper course. Yet, when he received Skogen's full speed and starboard orders, he issued directions for their execution.

Finally, the El Salvador is chargeable with two other negligent omissions. One was the failure to use the ship's searchlight to assist in looking for the missing black can buoy,[15] although Skogen admitted that if the light had been used he would not have had to station himself on the starboard wing in the search for the buoy, but could have remained at his normal station outside the wheelhouse. The other was the failure to use any of the El Salvador's instruments to set and check her course; rather, Skogen referred solely to shore lights, some of which he could not identify, and to the red can buoys, to which he admittedly did not know the distance.[16]

■ The Russell 18 also is chargeable with fault. Several years before the disaster a new engine and auxiliaries had been installed off center in the tug's port side, causing her to list to port. Her owners did not install permanent ballast to compensate for the added weight. Instead, to correct the list and to keep the tug on an even keel, the practice had been to use liquid ballast, specifically to carry 1000 gallons more fuel in the starboard wing tank than in the port wing tank. The failure to install permanent ballast would not of itself constitute negligence. However, on the morning of the disaster, instead of the required 1000 additional gallons of fuel in the starboard wing tank, it contained only 700. Furthermore, as a result of a leak, about eleven inches of fuel had accumulated in the lazarette, a small open space immediately astern of the tug's No. 4 fuel tank. The insufficient ballast and the fuel in the lazarette, either singly or in combination, rendered the Russell 18 unstable and readily susceptible to an unusual list which, as already noted, developed when the El Salvador began pulling the tug down Port Elizabeth Channel and was thereafter aggravated by the acts of the El Salvador previously specified. In the circumstances, the failure to maintain the ballast at its usual requirement in order to stabilize the tug and the failure to pump the fuel from the lazarette constituted negligence.[17]

■■ In sum, the various acts, omissions and faults of the ship and tug above discussed were substantially concurrent and contributory causative factors of the tug's sinking, and both must respond in damages to the claimants.[18] Moreover, whatever petitioners' relationship vis-a-vis one another by reason of Skogen's position as pilot, he still remained the agent of McAllister as far as claimants, innocent third parties, are concerned, and McAllister, as well as

15. Cf. National Dev. Co. v. City of Long Beach, 187 F.Supp. 109, 111 (S.D.Cal. 1960), aff'd, 289 F.2d 586 (9th Cir.), cert. denied, 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 95 (1961).

16. Cf. Russell, Poling & Co. v. United States, 151 F.Supp. 11, 16 (S.D.N.Y.1957) (dictum), aff'd, 252 F.2d 167 (2d Cir. 1958). See also, The Perth Amboy, 48 F.2d 640, 643 (D.Mass.1931).

17. See Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496, 497 (2d Cir. 1961); Sabine Towing Co. v. Brennan, 72 F.2d 490, 493–494 (5th Cir.), cert. denied, 293 U.S. 611, 55 S.Ct. 141, 79 L.Ed. 701 (1934); The Vestris, 60 F. 2d 273, 281 (S.D.N.Y.1932). Cf. The Kaiser Wilhelm Der Grosse, 145 F. 623 (2d Cir. 1906).

18. See Evans v. S. J. Groves & Sons Co., 315 F.2d 335, 348 (2d Cir. 1963); The Vestris, supra note 17, 60 F.2d at 291; Anderson v. Minneapolis, St. P. & S.S. M.R.R., 146 Minn. 430, 440–41, 179 N.W. 45 (1920); Dunham v. Village of Canisteo, 303 N.Y. 498, 503–506, 104 N.E.2d 872 (1952); Restatement (Second), Torts §§ 431–33 (1965); 2 Harper & James, Torts 1122–24 (1956); Prosser, Torts 220–21 (2d ed. 1955). See also, Petition of Kinsman Transit Co., 338 F.2d 708, 719 (2d Cir. 1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

Marina, is liable for his negligent conduct.[19]

▮ Although not entitled to exoneration from liability, the respective shipowners have sustained their plea of limitation of liability, since the faults attributable to each vessel were faults in seamanship and navigational conduct, for which they were not responsible and which occurred without their privity or knowledge.[20]

As to the tug, its instability was readily corrected by means of liquid ballast maintained in required proportions, and the tug crew was fully informed and knew of this requirement. Indeed, it appears that over extended periods prior to the tragedy, when the ballast in the tanks was properly maintained, no difficulty was encountered in the tug's stability. The failure to pump the fuel out of the lazarette similarly was an operational failure on the part of the tug's crew not chargeable to the owner.

As far as the El Salvador is concerned, no valid basis exists to support any claim that the vessel was unseaworthy to the knowledge of her owner. She has been cast in liability solely by reason of improvident navigational orders and conduct. Both petitioners are entitled to a decree of limitation.

## DAMAGES

▮ Preliminary to consideration of the separate damage claims,[21] some observations are in order in view of the differing contentions between petitioners and claimants. The awards are to be computed on a two-stage basis: (1) the damages to the date of decision are to be totalled without discount and increased by prejudgment interest,[22] and

19. See Pennsylvania R.R. v. The Beatrice, 275 F.2d 209, 213–214 (2d Cir. 1960); Publicker Industries v. Tugboat Neptune Co., 171 F.2d 48, 50 (3d Cir. 1948); Robbins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A., 261 N.Y. 455, 462–463, 185 N.E. 698, cert. denied, 290 U.S. 656–657, 54 S.Ct. 72, 78 L.Ed. 568 (1933).

20. See La Bourgogne, 210 U.S. 95, 122, 28 S.Ct. 664, 52 L.Ed. 973 (1908); The Edward E. Loomis, 86 F.2d 705, 708 (2d Cir. 1936); The Oneida, 282 F. 238, 240 (2d Cir. 1922); The William J. Riddle, 102 F.Supp. 884, 888 (S.D.N.Y.), aff'd, 200 F.2d 608 (2d Cir. 1952).

21. The claimants contend that their rights against Marina arise under New Jersey's wrongful death act, N.J.Stat.Ann. §§ 2A:-31–1 to 2A:31–6, and that their rights against McAllister arise under the Jones Act, 46 U.S.C. § 688. The petitioners do not dispute that this is the applicable law. See also, The Tungus v. Skovgaard, 358 U.S. 588, 591, 79 S.Ct. 503, 3 L.Ed. 2d 524 (1959); Schiemann v. Grace Line, Inc., 269 F.2d 596 (2d Cir. 1959); Armit v. Loveland, 115 F.2d 308, 311, 313 (3d Cir. 1940). Under both the state and the federal statutes the applicable rule as to damages is the same—the claimants may recover only their "pecuniary losses." See Michigan Cent. R.R. v. Vreeland, 227 U.S. 59, 69–71, 32 S.Ct. 192, 57 L.Ed. 417 (1913); Orona v. Isbrandtsen Co., 204 F.Supp. 777, 779 (S.D.N.Y.1962), aff'd, 313 F.2d 241 (2d Cir. 1963); Odlivak v. Elliott, 82 F.Supp. 607, 610 (D. Del.1949); Capone v. Norton, 8 N.J. 54, 83 A.2d 710, 714 (1951).

22. Although the Court of Appeals has not decided whether prejudgment interest may be awarded in Jones Act suits brought in admiralty, see Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 593 n. 13, 96 A.L.R.2d 1085 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962), such as the claimants' suits against McAllister, there is no doubt that it may be awarded in the suits against Marina, which arise under New Jersey law. See Meehan v. Central R.R., 181 F.Supp. 594, 620 (S.D.N.Y.1960); Danskin v. Pennsylvania R.R., 83 N.J.L. 522, 528–531, 83 A. 1006 (Ct.Err. & App. 1912). We perceive no logical basis for denying interest in the Jones Act claims. As the Court of Appeals itself has observed, the award of prejudgment interest gives " * * * a more equitable measure of the loss to the injured party—particularly in light of the progressively long delays in disposing of much of the litigation which must wait its turn on crowded court calendars. Moreover, the award of prejudgment interest discourages sham contentions and an improper use of the law's delays and thereby assists an earlier settlement between the

(2) future damages are to be discounted to their present value.[23]

■ The guiding considerations in determining damages are a decedent's earning capacity and what sum under all the circumstances he might reasonably have been expected to earn had he lived, and the extent to which the surviving dependents "might logically and reasonably have been expected to share in it." [24] In determining the reasonable expectation of pecuniary assistance or support of which the beneficiaries have been deprived, proper adjustment should be made for taxes,[25] personal expenses of the decedent and his share of the household expenses.[26] Also to be considered are decedent's actual earnings at the time of death, his work habits and his prospects for advancement.[27]

While the formula is readily stated, its application presents problems; indeed, it has been recognized that "[t]he exact quantum of pecuniary loss arising from a wrongful death is at best difficult to estimate." [28] Typical of most cases, the parties here are in sharp disagreement as to the future normal earning power of each decedent, the net sum likely to be available for contribution to the wife and children, and the share of which the wife and children will be deprived.

The claimants urge that future earnings should be calculated on the basis of increased wage rates and also advancement in position. The petitioners, in resisting the future damage claims, have pegged the earnings of each decedent to his actual income in the year of death and have made no allowance either for wage increases or advancement. This latter view is quite unrealistic, particularly so since during the pendency of these suits increases of up to twelve per cent were put into effect as of February 1, 1965, and it is not beyond the realm of reasonable probability that during the work expectancy of each decedent some increase in the wage scale of their respective job classifications may be realized. But the amount of increase projected by claimants throughout and to the final year of work expectancy is also questionable. While the industry has been favored with periodic wage raises and fringe benefits, also to be considered are the hazards of economic disloca-

parties." Petition of City of New York, 332 F.2d 1006, 1008 (2d Cir.), cert. denied, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed. 335 (1964). Accord, Moore-McCormack Lines, Inc. v. Richardson, supra, 295 F.2d at 592–95. See also, National Airlines, Inc. v. Stiles, 268 F.2d 400, 405–406 (5th Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 291, 4 L.Ed.2d 241 (1959).

23. LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 277 (2d Cir. 1965).

24. O'Connor v. United States, 269 F.2d 578, 582 (2d Cir. 1959). See also, Michigan Cent. R.R. v. Vreeland, 227 U.S. 59, 70, 33 S.Ct. 192, 57 L.Ed. 417 (1913).

25. See LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 276 (2d Cir. 1965); Montellier v. United States, 315 F.2d 180, 186 (2d Cir. 1963) (dictum); Meehan v. Central R.R., 181 F.Supp. 594, 613–614 (S.D.N.Y.1960). Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 313–314 (2d Cir. 1964), and McWeeney

v. New York, N.H. & H.R.R., 282 F.2d 34 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), are inapplicable, since the gross incomes involved in those cases were substantially lower than the incomes of the present decedents. See LeRoy v. Sabena Belgian World Airlines, supra 344 F.2d at 276; Cunningham v. Rederiet Vindeggen A/S, supra 333 F.2d at 315 n. 6.

26. O'Connor v. United States, 269 F.2d 578, 583 (2d Cir. 1959); Meehan v. Central R.R., 181 F.Supp. 594, 619–620 (S.D.N.Y.1960); Rogow v. United States, 173 F.Supp. 547, 560 (S.D.N.Y.1959).

27. See O'Connor v. United States, supra 269 F.2d note 26, at 582; Frasier v. Public Service Interstate Transp. Co., 244 F.2d 668, 670 (2d Cir. 1957); Briscoe v. United States, 65 F.2d 404, 406 (2d Cir. 1933).

28. Civil v. Waterman S.S. Corp., 217 F.2d 94, 99 (2d Cir. 1954).

tion, unemployment, reduced earning capacity by reason of age and other adverse factors.[29] Accordingly, the Court finds, as indicated hereinafter, that while some increase in earnings is warranted for potential wage step-ups and the prospect of advancement, it is not to the extent as urged by each claimant.

The parties also differ as to the share the dependents reasonably might have expected to receive from the decedents' available earnings. In seeking to enlarge their damage awards, the claimants have submitted elaborate charts. Typical is the Fargo claim. In a detailed projection over the work expectancy period, the wife, the decedent and their five children are deemed an aliquot of the total family unit. The husband's net income is then allocated in equal amounts to each until, when a child reaches majority, its aliquot share is eliminated and apportioned equally among the remaining members of the family. In addition, because the husband was at home only about one-third of the time, his portion of the household expenses is reduced by two-thirds, thereby increasing the amount available to the wife and children. Based thereon, the Court is urged to find that in the early years, when all five children are still minors, 95.2% of anticipated future earnings is the sum to be awarded to the wife and children, and that for the last ten-year period, when no child is a minor, the wife alone would receive 83.3% of available future earnings.

While the claimants' mathematically precise formulas have a neat surface appeal, the Court cannot accept them. They rest upon the assumption that a father's income is apportioned and distributed equally on a dollar-for-dollar basis among all the members of the family—parents and children—and totally disregard the true family relationship. This attempt to determine future earnings by regarding each member of the family as a mathematical digit is quite unrealistic. There are already enough "great imponderables"[30] in calculating these matters without engaging in illusory formulas. The damage determination does not lend itself to precise determination in the manner of an apothecary filling a prescription; at best it represents an empirical judgment based upon the evidence in each case, practical experience and common sense.

The Court finds that the amounts of contribution and the ensuing damages sustained by the beneficiaries of the deceased vary according to the number of children who are minors at given periods. In the instance of five children and a wife, the amount of contribution of which they have been deprived can reasonably be fixed at $83\frac{1}{3}\%$; four children, at 80%; three or two children, at 75%; one child, at $66\frac{2}{3}\%$; and where the wife is the sole beneficiary, at 50%.[31]

29. Cf. Briscoe v. United States, 65 F.2d 404, 406 (2d Cir. 1933); Dixon v. United States, 120 F.Supp. 747, 752 (S.D.N.Y. 1954), remanded on other grounds, 219 F.2d 10 (2d Cir. 1955); 2 Harper & James, Torts 1317 (1956).

30. McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34, 36 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960).

31. Understandably, no particular pattern emerges from the various cases. In Meehan v. Central R.R., 181 F.Supp. 594, 620 (S.D.N.Y.1960), a variant allocation according to the number of minor children was applied, ranging from $83\frac{1}{3}\%$, when there were five minors in the family, to 50%, for the wife alone. See also, O'Connor v. United States, 269 F.2d 578, 583 (2d Cir. 1959) (one child—$66\frac{2}{3}\%$; wife alone—50%); Petition of Moore-McCormack Lines, Inc., 184 F.Supp. 585, 593–594 (S.D.N.Y.1960), modified on other grounds, 295 F.2d 583 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962) (two children—75%, to wife alone—50%); Jennings v. United States, 178 F.Supp. 516, 531–532 (D.Md.1959), rev'd on other grounds, 291 F.2d 880 (4th Cir. 1961) (four children—75%, to wife alone—50%).

The petitioners also oppose any allowance for conscious pain and suffering.[32] It is true that the tug went under in a matter of two or three minutes and that death by drowning came quickly. But death was not instantaneous; each decedent, suddenly confronted with fast moving and alarming events beyond his control, struggled to save himself. Fargo and Salvesen were last seen by the surviving crew members on the deck of the tug with the water sweeping over her as she was going down. Their bodies were later recovered from the channel. Evans was found by the diver on the tug's deck when she lay on the channel floor, with his left leg jammed under a rail and his body, head down, over the side of the tug. It is clear that he and the others drowned only after a desperate struggle. Each went through a frightful, terrifying and painful experience—and while their suffering was short-lived, it was intensive, excruciating and agonizing.[33] In the instance of each decedent the Court is of the view that an award for conscious pain and suffering is warranted in the sum of $1,500.[34]

Another element of damage which is challenged is for the aid and services rendered by each decedent in and about the house. Each decedent was a homeowner. The category of services included painting, plumbing, roofing, carpentry, electrical wiring, lawn mowing, and the like. The evidence in the instance of each decedent supports a finding that this type of service was in fact performed; that each was a capable craftsman; and that, if he had not performed such services, the aid of skilled mechanics would have been required to keep the homes in repair and good condition. The services obviously have a value, and when similar services are required in the future, the claimants will have to pay for them. However, in considering the amount to be awarded, account also must be taken of the fact that in each instance some portion of the husband's activities reflected a hobby interest rather than services of a household nature. Such individual activity may not be considered in calculating the loss; only the reasonable expectation of the household service is compensable.[35]

32. The claims for pain and suffering arise against Marina under N.J.Stat.Ann. § 2A:15–3 see Meehan v. Central R.R., 181 F.Supp. 594, 598 (S.D.N.Y.1960); Ryan v. Public Service R.R., 103 N.J.L. 145, 134 A. 650 (Ct.Err. & App.1926), and against McAllister under the Jones Act, 46 U.S.C. § 688. See Dixon v. Serodino, Inc., 331 F.2d 668, 674 (6th Cir. 1964); The Black Gull, 82 F.2d 758, 760 (2d Cir.), cert. denied. 298 U.S. 684. 56 S.Ct. 954. 80 L. Ed. 1404 (1936).

33. "Mental agony" may be considered in making an award. See Civil v. Waterman S.S. Corp., 217 F.2d 94, 99 (2d Cir. 1954).

34. We do not read Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 587 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962), as establishing a rule of law concerning the hourly value of the pain and suffering endured while in the sea following the sinking of a vessel; the Richardson case itself recognized that "awards in each case turn on * * * many varied facts * * *." 295 F.2d at 587. Substantial awards have been allowed in this circuit for brief periods of pain and suffering. See Petition of the Diesel Tanker A.C. Dodge, Inc., 282 F.2d 86, 87–88 (2d Cir. 1960) ($5,000 award; tanker sank within five minutes; decedent enveloped in flames just prior to sinking); Civil v. Waterman S.S. Corp., 217 F.2d 94, 96, 99 (2d Cir. 1954) ($1,500 award; decedent stabbed during an altercation and "died soon thereafter"); Meehan v. Central R.R., 181 F.Supp. 594, 625–26 (S.D.N.Y.1960) ($10,000 award under New Jersey law for drowning when railroad car in which decedent was riding fell into river). Accord, Grantham v. Quinn Menhaden Fisheries, Inc., 344 F. 2d 590 (4th Cir. 1965) ($2,000 award; decedent drowned in a matter of minutes); Hickman v. Taylor, 75 F.Supp. 528, 530, 533 (E.D.Pa.1947), aff'd, 170 F.2d 327 (3d Cir. 1948), cert. denied, 336 U.S. 906, 69 S.Ct. 485, 93 L.Ed. 1071 (1949) ($1,000 award; decedent drowned in a matter of minutes).

35. See Michigan Cent. R.R. v. Vreeland, 227 U.S. 59, 74 (1913); Simpson v. United States, 322 F.2d 688, 692 (5th Cir. 1963); O'Connor v. United States, 269

We next consider the individual damage claims.

## FRANK FARGO

Frank Fargo, a mate aboard the Russell 18, was 34 years of age at the time of his death. His survivors are his wife, then 31 years of age, and five minor children. Fargo's life expectancy was 37.24 years and his wife's 45.67 years.[36] Their joint life expectancy was 33.56 years.[37] Fargo was in good health and was a steady worker, who since 1948 had progressed from deckhand to mate. For some time prior to his death he had studied to qualify himself for an officer's license.

## AWARD TO DATE

a. Loss of pecuniary contribution.

During the nine months Fargo worked in 1962 to the date of his death, he earned $7,498—about $833 per month, or at the rate of $10,000 per year. This was consistent with his previous earning record.

His federal and state taxes would have totalled approximately $1,080,[38] and his personal expenses, $1,120, totalling $2,-200, thereby leaving available for the family the sum of $7,800. From this sum there is to be deducted the portion of household expenses fairly attributable to decedent which, since there were five children to be clothed, fed and cared for in addition to the wife, the Court fixes at one-sixth, or 16⅔%, approximately $1,300. Thus, the amount of contribution of which the children and wife were deprived was the sum of $6,500 per annum, or approximately $542 per month. However, commencing February 1, 1965, the hourly wage rate for mates was increased by over 11%. A fair estimate is that decedent's gross earnings thereafter would have approximated $11,000[39] per annum. Deducting taxes and personal expenses [40] yields a sum available for the entire family of $8,780. Deducting one-sixth therefrom, or approximately $1,460, attributable to decedent's share of the household expenses, the sum of which the beneficiaries were deprived by reason of decedent's death, from February 1, 1965 to date, is at the rate of $7,320 a year, or $610 per month.

Accordingly, for the period from September 20, 1962 to February 1, 1965, a period of twenty-eight and one-third months, the loss at the rate of $542 per month is $15,357; from February 1, 1965 to date, a period of nine and one-half months, the loss at the rate of $610 per month is $5,795, a total in all of $21,152.

---

F.2d 578, 584 (2d Cir. 1959) ; Meehan v. Central R.R., 181 F.Supp. 594, 623 (S.D. N.Y.1960) (dictum); McCormick, Damages 349 (1935).

36. See U.S. Dep't of Health, Education and Welfare. United States Life Tables 1959–61, pp. 16–19.

37. See The S.S. Black Gull, 90 F.2d 619 (2d Cir.), cert. denied sub. nom., Faye v. American Diamond Line, 302 U.S. 728, 58 S.Ct. 50, 82 L.Ed. 562 (1937) ; Briscoe v. United States, 65 F.2d 404, 405–406 (2d Cir. 1933). A formula for obtaining joint life expectancies can be found in Jordan, Society of Actuaries Textbook on Life Contingencies 246 (1952).

38. Estimates of the taxes which decedents would have paid have been made on the basis of figures arrived at by using the standard deduction available under both federal and state law in lieu of itemized deductions. See McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34, 41 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960) (dissenting opinion) ; Petition of Moore-McCormack Lines, Inc., 184 F.Supp. 585, 593 n. 9 (S.D.N.Y.1960), modified on other grounds, 295 F.2d 583 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962).

39. The increase in wage rates would not necessarily produce an equivalent increase in gross income.

40. Taxes estimated at $1,100; personal expenses, $1,120.

b. Loss of nurture and guidance.

The five minor children who survived Fargo, and their ages at the time of his death are: Barbara, 11 years; Frank, 9 years; Susan, 6 years; Michael, 4 years; and Stephen, a 9 month infant. Fargo enjoyed a happy family life and his interest centered about his wife and children. He was a devoted and attentive father, who gave to the children the full measure of parental training, guidance and advice. However, his sea duties permitted him to spend but one-third of his time at home.

The evidence supports a finding that had he lived he would have continued to make a substantial contribution to his children's guidance, training and development during their minorities.[41] The Court is of the view that the loss of nurture of which each child has been deprived during minority is at the rate of $600 per year, except in the case of the infant, who was 9 months when decedent met his untimely death. Thus, the four oldest children are each entitled to $1,900 for the period of almost thirty-eight months from September 20, 1962 to the present, a total of $7,600; in the instance of the 9 month old infant, in view of his age, the award is fixed at $1,000. In sum, the total award for loss of nurture is $8,600.

c. Other damages.

The Court has previously noted its award of $1,500 for conscious pain and suffering. Also previously discussed is the loss of decedent's services in performing various household chores, which the Court finds to be of an annual value of $200, or a total of $633 from the date of death to the present. And finally, there are the funeral charges, as to which there is no dispute, amounting to $1,168.[42]

To recapitulate, the total award to date is as follows:

| | |
|---|---|
| Loss of pecuniary contribution: | $21,152 |
| Loss of nurture | $ 8,600 |
| Other damages: | $ 3,301 |
| Total: | $33,053 |

POST JUDGMENT AWARD

d. Future loss of contribution.

At the time of death Fargo's work expectancy was thirty-one years, that is, until age 65 through the year 1993.[43] Damages having been allowed to the present, there remain to be considered future losses over a period of twenty-eight years. During this span each child will have attained majority, but in a different year. This circumstance not only will eliminate tax exemptions, thereby increasing the amount of income taxes, but will also increase the amount fairly attributable to decedent's share of the household expenses. Also to be considered are any likely increases in rates and job advancement. Taking into account all elements, favorable and unfavorable, previously discussed, the Court finds that some in-

---

41. See Norfolk & Western Ry. v. Holbrook, 235 U.S. 625, 629, 35 S.Ct. 143, 59 L.Ed. 392 (1915); Michigan Cent. R.R. v. Vreeland, 227 U.S. 59, 71, 33 S.Ct. 192, 57 L.Ed. 417 (1913); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 593 n. 9a (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962); Orona v. Isbrandtsen Co., 204 F.Supp. 777, 782 (S.D.N.Y.1962), aff'd, 313 F.2d 241 (2d Cir. 1963).

42. See Oregon Short Line R.R. v. United States, 145 F.2d 1, 3 (9th Cir. 1944); Jutila v. Frye, 8 F.2d 608 (9th Cir. 1925); Hennessey v. Burlington Transp. Co., 103

F.Supp. 660, 665 (D.Mont.1950). See also, Moore v. The O/S Fram, 226 F.Supp. 816, 818 (S.D.Tex.1963), aff'd, 328 F.2d 868 (5th Cir. 1964); McCormick, Damages 356 (1935); N.Y.Decedent Estate Law, McKinney's Consol.Laws, c. 13, § 176.

43. Compare LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 275 (2d Cir. 1965); Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 311–312 (2d Cir. 1964); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 589–590 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962).

crease in gross income over the future period is indicated, and that the contribution of which the wife and children have been deprived is as follows:

| Date | Gross Income | Deductions [44] | Amount Available For Family | No. of Minors | Amount Available To Wife and Children | No. of Years | Total for Period |
|---|---|---|---|---|---|---|---|
| 1966–67 | $11,000 | $2,220 | $8,780 | 5 | $7,320 (83⅓%) | 2 | $ 14,640 |
| 1968–72 | $11,500 | $2,460 | $9,040 | 5 | $7,530 (83⅓%) | 5 | $ 37,650 |
| 1973–74 | $11,500 | $2,590 | $8,910 | 4 | $7,130 (80%) | 2 | $ 14,260 |
| 1975–77 | $11,500 | $2,730 | $8,770 | 3 | $6,580 (75%) | 3 | $ 19,740 |
| 1978–79 | $11,500 | $2,870 | $8,630 | 2 | $6,470 (75%) | 2 | $ 12,940 |
| 1980–82 | $11,500 | $3,020 | $8,480 | 1 | $5,650 (66⅔%) | 3 | $ 16,950 |
| 1983–93 | $11,500 | $3,190 | $8,310 | 0 | $4,155 (50%) | 11 | $ 45,705 |

Total for twenty-eight years before discount: $161,885

Average [45] for each year is: $ 5,782

The present value of an annuity of $1.00 for twenty-eight years at 4% is $16.663, which multiplied by the annual average of $5,782 totals: $ 96,345

44. Personal expenses estimated at $1,120 for 1966–67 and at $1,250 for 1968–93; remaining deductions are for taxes.

45. The range of contributions permits averaging since it does not seriously distort the result. See LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 278 (2d Cir. 1965).

e. Future loss to children—nurture, guidance and training.

| Name | Years | Before Discount | Factor at 4% | Present Value |
|---|---|---|---|---|
| Barbara | 7 x 600 | $ 4,200 | 6.002 | $ 3,601 |
| Frank | 9 x 600 | $ 5,400 | 7.435 | $ 4,461 |
| Susan | 12 x 600 | $ 7,200 | 9.385 | $ 5,631 |
| Michael | 14 x 600 | $ 8,400 | 10.563 | $ 6,338 |
| Stephen | 17 x 600 | $10,200 | 12.166 | $ 7,300 |
| Total before discount: | | $35,400 | | |
| Amount of award at present value: | | | | $27,331 |

---

f. Deprivation of pension benefits.

Fargo, by reason of a collective bargaining agreement between his union and an employers' association, would have been entitled to pension benefits after age 65 at the rate of $1,500 for the remainder of his life. The widow's reasonably expected participation in such benefits is an element of damage.[46] As already noted, their joint expectancy was 33.56 years. At age 65, when he would have been entitled to receive his pension benefits, he would have lived thirty-one years, leaving a period of about two and one-half years, during which benefits at the rate of $1,500 per annum would have totalled $3,750, of which the wife's participation is fixed at 50%, or $1,875, the present value of which, discounted at 4%, is $583.

g. Future loss of aid and services.

Having made an award for loss of aid to the date hereof, a period of almost thirty-eight months, the period of future loss is slightly over thirty years (based upon joint expectancy) at the rate of $200 a year, a total of $6,000, which reduced to present value at a factor of 17.-292 is $3,458.

To recapitulate, post judgment award in the sum of $127,717, together with prejudgment award in the sum of $33,-053, entitles this claimant to a total judgment in the sum of $160,770.[47]

## CARL A. SALVESEN

Carl A. Salvesen was employed as an oiler aboard the tug, and such had been his occupation for some three years before his death. He was then 29 years of age and his wife, 27 years. Salvesen's life expectancy was 41.92 years and his wife's, 49.52 years.[48] Their joint life expectancy was 37.84 years. The survivors also included four minor children. Salvesen was in excellent health and was a steady, industrious worker.

## AWARD TO DATE

a. Loss of pecuniary contribution.

During the nine months Salvesen worked in 1962 up to his death he earned $6,396, approximately $711 per month, or at a the rate of approximately $8,500 per year. This was consistent with his previous earning record. His federal and state taxes would have totalled approximately $890, and his personal expenses $1,000, totalling $1,890, leaving available for the entire family the sum of $6,610. From this sum there is to be deducted the portion of household expenses fairly attributable to decedent which, considering there were four minor children and

---

46. Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 316 (2d Cir. 1964).

47. Upon the trial the petitioners waived any claim of contributory negligence on the part of the decedents.

48. See U.S. Dep't of Health, Education and Welfare, United States Life Tables 1959–61, pp. 16–19.

a wife to be fed and clothed, the Court fixes at one-fifth, or 20%, $1,320. Thus, the amount of contribution of which the wife and children were deprived is the sum of $5,290 per annum, or $441 per month. However, commencing February 1, 1965, the hourly wage rate for oilers was increased by approximately 10%. It is estimated that thereafter the decedent's annual gross earnings would have reached approximately $9,300. Deducting taxes and personal expenses [49] yields a sum available for the entire family of $7,420. Deducting 20%, or $1,480, attributable to the decedent's share of the household expenses, the sum of which the beneficiaries were deprived by reason of decedent's death, from February 1, 1965 to date, is at the rate of $5,940 a year, or approximately $495 per month. Thus, for the period from September 20, 1962 to February 1, 1965, a period of twenty-eight and one-third months, the loss at the rate of $441 a month is $12,495; from February 1, 1965 to date, a period of nine and one-half months, the loss at the rate of $495 a month is $4,703, a total in all of $17,198.

b. Loss of nurture and guidance.

The four minor children who survived Salvesen and their ages at the time of his death are: Denise Theresa, 6 years; Vickie Laura, 5 years; Beth Ann, 3 years, 7 months; Timothy Carl, a 2½ month infant. Salvesen was deeply devoted to his family, and his wife and children were the center of his life interest. His checks were sent directly by his employer to his wife. He was a vestryman and took the children to Sunday School when at home. He gave his children the full measure of parental training, guidance and advice. However, the demands of his occupation permitted him to spend but one-third of his time at home.

The evidence supports a finding that had he lived he would have continued to make a substantial contribution to his children's guidance, training and development during their minorities. The Court is of the view that the loss of nurture of which each child has been deprived is at the rate of $600 per year, or $50 per month per child during minority, except in the case of the 2½ month infant. Thus, the three older children are each entitled to $1,900 for the period of almost thirty-eight months from September 20, 1962 to the present, which totals $5,700; in the instance of the 2½ month infant, the award to the date hereof is fixed at $1,000, making a total award of $6,700.

c. Other damages.

The Court awards $1,500 for conscious pain and suffering; in addition, for loss of the husband's services, at the rate of $200 per year from September 20, 1962 to date, a period of three years and almost two months, the sum of $633; also, the funeral expenses in the sum of $1,237.

To recapitulate, the losses to date hereof are as follows:

| | |
|---|---|
| Loss of pecuniary contribution: | $17,198 |
| Loss of nurture: | $ 6,700 |
| Other damages: | $ 3,370 |
| Total: | $27,268 |

### POST JUDGMENT AWARD

d. Future loss of contribution.

Prior to his service as an oiler on the Russell 18 Salvesen had been a laborer in the employ of the Federal Government. He sought to improve his position as a tugboat employee, purchased books and studied in preparation for the assistant engineer's examination. The reasonable probability is that, considering Salvesen's industry and ambition, he would have advanced somewhat in his status. Taking into account all relevant factors, the Court finds that some increase in gross

---

**49.** Taxes estimated at $880 and personal expenses at $1,000.

income over the period of life expectancy is indicated, and that the contributions of which the wife and children have been deprived are as follows:

| Date | Gross Income | Deductions [50] | Amount Available For Family | No. of Minors | Amount Available To Wife and Children | No. of Years | Total for Period |
|---|---|---|---|---|---|---|---|
| 1966-67 | $ 9,300 | $1,880 | $7,420 | 4 | $5,940 (80%) | 2 | $ 11,880 |
| 1968-77 | $10,500 | $2,260 | $8,240 | 4 | $6,590 (80%) | 10 | $ 65,900 |
| 1978 | $10,500 | $2,410 | $8,090 | 3 | $6,070 (75%) | 1 | $ 6,070 |
| 1979-80 | $10,500 | $2,540 | $7,960 | 2 | $5,970 (75%) | 2 | $ 11,940 |
| 1981-83 | $10,500 | $2,670 | $7,830 | 1 | $5,220 (66⅔%) | 3 | $ 15,660 |
| 1984-98 | $10,500 | $2,830 | $7,670 | 0 | $3,835 (50%) | 15 | $ 57,525 |

Total for thirty-three years before discount: $168,975

Average for each year is: $ 5,120

The present value of an annuity of $1.00 for thirty-three years at 4% is $18.148, which multiplied by the annual average of $5,120 totals: $ 92,917

e. Future loss to children—nurture, guidance and training.

| Name | Years | Before Discount | Factor at 4% | Present Value |
|---|---|---|---|---|
| Denise | 12 x 600 | $ 7,200 | 9.385 | $ 5,631 |
| Vickie | 13 x 600 | $ 7,800 | 9.986 | $ 5,992 |
| Beth | 15 x 600 | $ 9,000 | 11.118 | $ 6,671 |
| Timothy | 18 x 600 | $10,800 | 12.659 | $ 7,595 |

Total before discount: $34,800

Amount of award at present value: $25,889

———◆———

50. Personal expenses estimated at $1,000 for 1966–67 and at $1,150 for 1968–98; remaining deductions are for taxes.

f. Deprivation of pension benefits.

This decedent, too, was a participant in the pension benefit plan. The joint life expectancy of decedent and his wife was 37.84 years. At age 65 he would have lived thirty-six years, leaving a period of about two years during which the pension benefits at the rate of $1,500 per annum would have totalled $3,000, of which the wife's participation at 50% is $1,500, the present value of which, discounted at 4%, is $388.

g. Future loss of aid and services.

Having made an award for loss of services to the date hereof, a period of almost thirty-eight months, the period of future loss is about thirty-five years (based upon joint expectancy) at the rate of $200 a year, a total of $7,000, which reduced to present value at a factor of 18.665 is $3,733.

To recapitulate, post judgment award in the sum of $122,927, together with prejudgment award in the sum of $27,268, entitles this claimant to a total judgment in the sum of $150,195.

## NORMAN EVANS

 Norman Evans, first assistant engineer aboard the tug, was 28 years of age at the time of his death. His widow, the sole survivor, was of the same age. His life expectancy was 42.85 years and his wife's, 48.55; their joint life expectancy was 38.12 years. Evans was in good health and was a steady worker. He had been employed as an assistant engineer aboard the tugboat less than a year when he was drowned.

### AWARD TO DATE

a. Loss of pecuniary contribution.

During the nine months Evans worked in 1962 prior to his death his gross earnings were $7,611, or on a projected yearly basis at the rate of approximately $10,100 per annum. His annual federal and state taxes would have amounted to $1,890 and his personal expenses, $1,100, totalling $2,990, thereby leaving available for his wife and himself the sum of $7,110. The Court finds that 50% is the portion attributable to decedent, and accordingly the amount of annual contribution of which the wife was deprived is the sum of $3,555, or $296 per month. However, as of February 1, 1965, the hourly wage rate for assistant engineers was increased by over 11%. It is estimated that his gross annual earnings thereafter would have reached approximately $11,000 per annum. Deducting taxes and personal expenses [51] yields $8,080 as the sum available for decedent and his wife, of which 50% is attributable to decedent's share, thereby depriving the wife of contribution in the sum of $337 per month. Accordingly, from September 20, 1962 to February 1, 1965, a period of twenty-eight and one-third months, at the rate of $296 per month, the loss is $8,387; from February 1, 1965 to date, a period of nine and one-half months, at the rate of $337 per month, the loss is $3,202, a total in all of $11,589.

b. Other damages.

In addition to the above, there is allowed for conscious pain and suffering, as already noted, the sum of $1,500; for loss of services at the rate of $200 per annum for a period of three years and almost two months, the sum of $633; and finally, $1,362 for funeral expenses.

To recapitulate damages to date:

| | |
|---|---|
| Loss of pecuniary contribution: | $11,589 |
| Other damages: | $ 3,495 |
| Total: | $15,084 |

### POST JUDGMENT AWARD

c. Future loss of contribution.

At the time of his death Evans' work expectancy was thirty-seven years, that is, until age 65 through the year 1999. Damages having been allowed to date, the future loss is to be evaluated over a thirty-four year period. Evans was much interested in mechanics; he sought to improve his work qualifications, and prior to his death was engaged in prepara-

---

51. Taxes estimated at $1,820; personal expenses at $1,100.

tion for the chief engineer's examination which he planned to take when eligible. He was a high school graduate.

Taking into account his industry and all significant factors, favorable and adverse, the Court finds that some increase in gross income over the future period is indicated and that the contribution of which the wife has been deprived is as follows:

| Date | Gross Income | Deductions [52] | Amount Available for Family | Amount Available To Wife | No. of Years | Total for Period |
|------|------|------|------|------|------|------|
| 1966–67 | $11,000 | $2,920 | $8,080 | $4,040 (50%) | 2 | $ 8,080 |
| 1968–99 | $11,500 | $3,210 | $8,290 | $4,145 (50%) | 32 | $132,640 |

| | |
|---|---|
| Total for thirty-four years before discount: | $140,720 |
| Average for each year is: | $ 4,139 |
| The present value of an annuity of $1.00 for thirty-four years at 4% is $18.411, which multiplied by the annual average of $4,139 totals: | $ 76,203 |

d. Deprivation of pension benefits.

Evans also was a participant in the pension benefit plan. The joint expectancy of decedent and his wife was 38.12 years. At age 65 he would have lived thirty-seven years, leaving a period of about one year during which his pension benefits would have totalled $1,500, of which the wife's pecuniary loss at 50% is $750, the present value of which, discounted at 4%, is $190.

e. Future loss of aid and services.

Having made an award for loss of services to the date hereof, a period of almost thirty-eight months, the period of future loss is thirty-five years (based upon joint expectancy) at the rate of $200 a year, a total of $7,000, which reduced to present value at a factor of 18.665 is $3,733.

To recapitulate, post judgment award in the sum of $80,126, together with pre-judgment award in the sum of $15,084, entitles the claimant to a total judgment in the sum of $95,210.

All awards to the claimants herein to the date of judgment shall be increased by prejudgment interest at the rate of 4% per annum, the interest to run from the several dates at which monthly sums would have accrued, as set forth in Moore-McCormack Lines, Inc. v. Richardson.[53]

## THE INDEMNITY CLAIMS

Finally, there remain the respective claims asserted by each petitioner against the other. Marina urges that it is entitled to be indemnified by McAllister for the damages imposed against it in favor of the respective claimants. Its basic contention appears to be that it has been cast in liability because of pilot Skogen's negligent acts and conduct, and that these constituted a breach of implied warranty by McAllister of Skogen's competency as a pilot. This plea must be rejected. First, it was not only Skogen's negligent conduct, but also that of the El Salvador's master and crew, which has resulted in holding the El Salvador liable. Their conduct was as much a substantially contributing and causative factor for the mishap as Skogen's. Second, the contract under which the Russell 18

52. Personal expenses estimated at $1,100 for 1966–67 and at $1,250 for 1968–99; remaining deductions are for taxes.

53. 295 F.2d 583, 595 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L. Ed.2d 526 (1962). See also, LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 277 (2d Cir. 1965).

was engaged to assist the El Salvador contained the usual New York Harbor pilotage clause.[54] Under its terms Skogen, although a general employee of McAllister, became the employee of Marina with respect to handling the vessel, and Marina assumed responsibility for his conduct and in consequence is chargeable for his negligent pilotage. The clause further provides that neither the tug nor its owner shall be liable for any damage resulting therefrom. The validity of the agreement which exonerates McAllister, the tugboat owner, from liability to Marina, the shipowner, for damages arising out of Skogen's negligent pilotage is not open to question.[55]

Marina, to overcome the force of the pilotage clause, urges that Skogen's acts were so flagrant that he was generally incompetent and that this constituted a breach of an implied warranty of competency by McAllister. However, apart from the legal issue as to whether such a warranty may be implied in the face of the express agreement of the pilotage clause, the evidence does not support Marina's claim that Skogen was generally incompetent. The fact that on this occasion he was negligent does not, in and of itself, establish the charge of general incompetency.[56] Skogen was a licensed pilot with seventeen years experience in the New York waters, plus additional experience at sea.

Marina makes a further contention that it is entitled to indemnity because of the negligent conduct attributable to the tug. However, McAllister as well as Marina has prevailed upon its limitation plea.[57] The stipulated value of its tug is $70,000; that of the El Salvador is $535,172. Thus, the combined funds are in excess of the awards, which total in round figures $406,000. The application of the tug's fund on account of the awards would at once exhaust it. Not only is this fund inadequate to meet the claimants' awards, but Marina, as a tortfeasor, is not entitled to participate there-

54. "When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

Marina seems to raise an issue that this clause was not in effect. However, the evidence abundantly establishes it was incorporated in the schedule annexed to the contract between it and McAllister dated January 1, 1955, and in subsequent schedules, as well as in various bills rendered to Marina for pilot's services. The course of conduct between the parties leaves no room to doubt that the "pilotage clause" was part of the agreement between them.

55. Bisso v. Inland Waterways Corp., 349 U.S. 85, 93–94, 75 S.Ct. 629, 99 L.Ed. 911 (1955) (dictum); Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135,

77 L.Ed. 311 (1932); Transpacific Carriers Corp. v. Tug Ellen F. McAllister, 336 F.2d 371 (2d Cir. 1964).

56. Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co., 197 F. 703, 708 (9th Cir. 1912); The Elton, 142 F. 367, 372 (3d Cir. 1906).

57. McAllister is entitled to limitation of liability against Marina as well as against the claimants. The right to limitation will not be deemed waived by contract unless " * * * the evidence relied upon to establish the claimed waiver is sufficiently clear and convincing to be taken to establish that fact." The Grecian, 78 F.2d 657, 660 (2d Cir. 1935). It is clear upon the present facts that McAllister's right was not waived, for the schedule containing the pilotage clause also provided:

"The furnishing of any service or anything done in connection therewith shall not be construed to be or give rise to a personal contract, and it is understood that we and any vessels we may furnish, and their owners, charterers, operators, managers and agents, shall have the benefit of all exemptions from, and limitations of, liability to which an owner of a vessel is entitled, under the Limitation of Liability Statutes of the United States."

in as against the innocent claimants.[58] Marina's claim for indemnification is denied.

■ McAllister, for its part, also seeks indemnity from Marina for its liability to claimants, as well as for $98,383 damages allegedly sustained by the tug. But McAllister, too, has been cast in liability by reason of the negligent conduct of the tug crew members, its own employees, which also substantially contributed to and was a causative factor of the tug's sinking. In addition, insofar as McAllister's claim against Marina is predicated upon Skogen's negligence, recovery is precluded upon the facts here presented. While the pilotage clause has been upheld insofar as it relieves the tug owner from liability to the shipowner for damages arising out of the pilot's negligent handling of the ship, its validity with respect to the tug owner's right to recover damages from the shipowner based upon such negligence—negligence of its own general employee, but "temporarily" acting as the servant of the shipowner—has not yet been determined by the Supreme Court. It has, however, observed:

> "An agreement that one shall not be liable for negligence of a third person cannot easily be read as an agreement that one is entitled to collect damages for negligence of that third person. And there is no reason to stretch contractual language to force payment of damages under circumstances like these. A person supplying his own employees for use by another in a common undertaking cannot usually collect damages because of negligent work by the employee supplied. Clear contractual language might justify imposition of such liability." [59]

The pilotage clause here is devoid of such "clear contractual language" as to support McAllister's claim for recovery of damages from Marina.

Other reasons also require denial of the McAllister indemnity claim. Since the $70,000 representing the tug's value is substantially below the share of the total award to claimants for which, in the absence of limitation, McAllister would be liable, it is clear that the bulk of the judgment will be satisfied out of the El Salvador fund. To permit McAllister, jointly and severally responsible with Marina, to participate in the unexpended balance of the El Salvador fund would be inequitable.[60]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit decree in accordance with the foregoing.

---

58. See The Catskill, 95 F. 700, 702 (S.D. N.Y.1899), cited in Petition of the Diesel Tanker A. C. Dodge, Inc., 282 F.2d 86, 89 n. 1 (2d Cir. 1960).

59. United States v. Nielson, 349 U.S. 129, 131, 75 S.Ct. 654, 656, 99 L.Ed. 939 (1955).

60. See Petition of the Diesel Tanker A. C. Dodge, Inc., 282 F.2d 86, 88–89 (2d Cir. 1960).